## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JAMES R. STINGLEY,

      Plaintiff,

      vs.                                     Civ. No. 24-73 JCH/KK

MICHELLE A. KING, Acting Commissioner of
Social Security,

      Defendant.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

THIS MATTER is before the Court on Plaintiff James Stingley's ("Claimant") Motion for Reversal and Remand for Further Proceedings and memorandum in support thereof (Docs. 12, 13) ("Motion"), filed May 17, 2024, in which he appeals the denial of his claims for disability insurance benefits and asks the Court to remand this matter to the Social Security Administration for further proceedings. (Doc. 13 at 9.) Defendant the Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition to the Motion on July 15, 2024, and on July 29, 2024, Claimant filed a reply in support of his Motion. (Docs. 19, 20.) Having meticulously reviewed the entire record and the relevant law, I find that the ALJ erred in assessing Claimant's residual functional capacity because she failed to account for the effects of his migraine headaches, rendering her decision contrary to law and not supported by substantial evidence. I therefore recommend that the Court GRANT Claimant's Motion, reverse the Commissioner's

---

[1] By an Order of Reference (Doc. 10) entered on April 16, 2024, Senior United States District Judge Judith C. Herrera referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

decision denying benefits, and remand this matter to the Commissioner for further administrative proceedings.

## I.    **Factual Background**

Claimant filed this action under 42 U.S.C. § 405(g), seeking reversal of the Commissioner's decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. (Docs. 1, 12, 13.) Claimant, who was born in 1982, has a high school education and has worked as a stores laborer, solar energy system installer, manufacturing helper, and parking lot attendant. (AR 24.) In 2016, he began experiencing chronic back pain and headaches. (*See* AR 699.) In addition to being diagnosed with intractable chronic migraine headaches, degenerative disc disease of the lumbar spine without nerve root compression, mild degenerative change of the cervical spine, and a benign pre-sacral spinal tumor, he suffers from mild obesity, hypertension, chronic kidney disease, and an enlarged prostate. (*See* AR 19, 629.)

### A.  Procedural History

Claimant applied for DIB on January 28, 2021, alleging disability beginning on September 9, 2020. (AR 17, 109.) His claims were denied on initial consideration in May 2021, and on reconsideration in August 2022. (AR 115-119, 127-132.)

Administrative Law Judge ("ALJ") Michelle Lindsay held a hearing on May 3, 2023, at which Claimant and an impartial vocational expert ("VE") testified. (AR 17, 32-58.) On June 22, 2023, the ALJ issued an unfavorable decision in which she concluded that Claimant is not disabled and, therefore, not entitled to disability benefits. (AR 14-25.) The Appeals Council denied review on November 21, 2023, and the ALJ's decision became administratively final. (AR 1-3.) Claimant now seeks reversal and remand of the ALJ's decision finding that he is not disabled. (Docs. 1, 12, 13.) On appeal, he challenges one aspect of the ALJ's decision: her alleged failure to account for

the effects of his chronic migraine headaches in rendering her disability determination. (*See* Doc. 13 at 1.)

### B. Evidence Regarding Claimant's Medically Determinable Impairments[2]

Claimant began experiencing chronic headaches, as well as back pain, in 2016. (*See* AR 699.) In January 2018, he went to the emergency room due to back pain and a headache that was causing throbbing at the back of his head that wrapped around to his temples. (AR 67.) He reported that his headache worsened with walking and that he had been experiencing headaches daily for the past year. (*Id.*) He was diagnosed with headaches on suspicion of myofascial pain of trapezius and paraspinals. (*Id.*)

A few days after his visit to the ER, Claimant received trigger point injections ("TPI") to treat his myofascial pain. (*Id.*) He reported temporary resolution of both his neck and shoulder pain as well as his headaches; however, his headaches returned after three weeks, though they were not as intense. (*Id.*) After receiving another round of TPI, Claimant again experienced headache relief for about three weeks. (*Id.*) In May 2018, Claimant reported that his headaches, neck pain, and shoulder pain resolved after TPI. (AR 68.) However, in July 2018, he reported that his headaches and upper back pain returned. (*Id.*) In September 2018 when he reported that TPI was "less effective for his headaches[,]" Claimant was referred to a neurologist. (*Id.*)

In November 2018, Claimant was diagnosed with intractable chronic migraine without aura without status migrainosus and began receiving quarterly Botox injections to treat his headaches. (*See* AR 69-70, 470-71, 478, 479, 482, 629.) As of June 2019, he was not only receiving Botox

---

[2] Although the Court has meticulously reviewed the entire record, its discussion of the evidence focuses on that which relates to and reflects Claimant's headaches as his only argument on appeal relates to the ALJ's alleged failure to account for the effects of his headaches. (*See* Doc. 13.)

injections but also taking Sumatriptan, a prescription medication, and medical cannabis to treat his headaches. (*See* AR 69, 482.)

In September 2019, Claimant began seeing a physical therapist for treatment of his headaches, as well as his chronic neck and back pain. (*See* AR 486-488.) With respect to his headaches, the goal of treatment was for Claimant to be able to report "3 or less headaches a week to improve concentration." (AR 485.) On both September 13 and September 25, 2019, he reported that he continued to experience headaches. (*See* AR 486-487.) On October 11, 2019, he reported that he continued to have "high pain without headache relief" and only temporary improvement of his headache with traction therapy. (AR 484.) He underwent vertebral artery testing, which was negative, but it was noted that "there is still concern for vascular issues due to no change with musculoskeletal improvement." (AR 485.) He was discharged from physical therapy treatment on that date due to "no improvement with therapy" with a recommendation that he return to his primary care physician. (AR 485.)

On October 18, 2019, Claimant received another Botox injection to treat his chronic migraines. (AR 478.) It was noted that "[c]onventional methods of treatment with medications have been utilized but the patient has been unresponsive and refractory" but that Claimant reported "improvement in headache frequency since starting Botox." (AR 478-479.) On that date, Claimant also reported issues with snoring, and he was referred for evaluation for sleep apnea. (AR 479-480.)

On October 25, 2019, Claimant saw a sleep specialist, who concluded that his symptoms—which included snoring, morning headaches, and daytime fatigue and tiredness—"are concerning for sleep apnea" and referred Claimant for a sleep study. (AR 476-477.) Following a sleep study,

4

Claimant was diagnosed with obstructive sleep apnea and sleep-related hypoxia. (AR 473.) He eventually began CPAP therapy. (*See* AR 453, 465-466.)

On January 28, 2020, Claimant was treated with another quarterly Botox injection. (AR 470-471.) At that time, he was also prescribed Aimovig injections to help treat his migraines. (*See* AR 444, 630.) Claimant was scheduled to receive another quarterly Botox injection but cancelled the appointment in April 2020, shortly after the outbreak of the COVID-19 pandemic. (*See* AR 455.)

In October 2020, Claimant established primary care with Dr. Philip Call following a trip to the ER for treatment of abdominal pain. (*See* AR 444.) At his intake session with Claimant, Dr. Call noted the following regarding Claimant's headaches:

- Has chronic migraines.
- Takes cannabis which helps but still wakes with headaches.
- Was on Aimovig injections but did not help.
- Followed by neurology, has not been able to find anything that gets rid of the headaches.
- Had injections (thinks it was botox)
- Has been taking oxycodone for the migraines and for his lower back pain.

(AR 444.) Dr. Call also noted Claimant's report that he was "diagnosed with sleep apnea but has not tolerated the CPAP machine." (AR 445.) At that time, Dr. Call began treating Claimant's epigastric abdominal pain and referred him for management of his chronic low back pain. (AR 446-447.)

On November 5, 2020, Claimant went to the ER with complaints of a headache and abdominal pain, both lasting more than three days. (AR 430.) He was treated with a "migraine cocktail" for what was diagnosed as a "tension headache" and also given a "GI cocktail" to address his abdominal pain. (AR 432.)

On December 10, 2021, Claimant again sought treatment for his migraines, at which time he described his headaches as "random," noting that he will often awaken with a headache and that the sun makes them worse. (AR 851, 853.) He reported that Botox injections had been ineffective, and that Sumatriptan made him feel worse. (AR 853.) Noting that Claimant had forgotten to take his blood pressure medications that morning, his treating provider queried whether his migraines "[c]ould be due to uncontrolled blood pressure versus sleep apnea versus arthritis in the cervical spine?" and noted that further assessment would need to occur before putting Claimant on preventative medication for his headaches. (AR 855-856.) He was administered an injection of ketorolac[3], given a prescription for ibuprofen (Advil; Motrin), and directed to take Tylenol as needed to manage his headaches. (AR 851, 854, 856, 1048, 1050.) He was also directed to monitor his blood pressure readings and return for a follow up visit. (AR 856.)

On January 3, 2022, at his follow-up visit with Dr. Call, it was noted that he continued to have elevated blood pressure readings, even with consistent use of medications. (AR 851-852.) Regarding Claimant's headaches, which continued to be one of his chief complaints, Dr. Call noted that they "may not be related to migraines, they could be related to his blood pressure or his sleep apnea" and included as part of Claimant's plan to "follow-up with sleep medicine and modify his blood pressure regimen to see if this is helpful." (AR 851-52.)

On February 4, 2022, Claimant was seen by Dr. Lenora Mathes at the Presbyterian Sleep Disorders Clinic on referral of Dr. Call based on "complaints of waking up with morning headaches, difficulty falling asleep, snoring and witnessed apneas[.]" (AR 836.) Dr. Mathes noted, "At least every other day the patient wakes up with a morning headache that can linger throughout

---

[3] Ketorolac, is a nonsteroidal anti-inflammatory drug used to relieve moderately severe pain, usually after surgery. https://medlineplus.gov/druginfo/meds/a693001.html (last accessed Jan. 9, 2025).

the day" and that Claimant "is motivated to retry CPAP therapy[,]" which he previously tried but discontinued because he became more congested wearing the CPAP mask and found sleeping more difficult. (AR 836.)

On March 28, 2023, Claimant again presented to Dr. Call with complaints of a headache, as well as fatigue, and difficulty tolerating his CPAP machine. (AR 747.) Dr. Call recommended that Claimant contact his dentist to talk about a dental appliance that might be able to help with his sleep apnea. (AR 747-748.)

At his hearing before the ALJ on May 3, 2023, Claimant testified that he has headaches "every day" that are sometimes "very severe" and can be triggered by light. (AR 32, 44, 50.) The headaches sometimes last all day and make it "hard to focus" and "hard to . . . do anything throughout the day because" he just "want[s] to lay down." (AR 45, 50.) On the day of his hearing, Claimant testified that he had a headache and that "it's not going away no matter what I do, what I take, it's just there." (AR 46.) To get rid of the pain, he usually tries to lie down in a dark room without the lights on. (AR 46.) He sometimes lies down for six hours a day. (AR 47.) As of the time of his hearing, Claimant was taking only Tylenol for his headaches as he could not take other medication due to the condition of his liver and kidneys.[4] (AR 48, 50; *see* AR 722.) If he cannot get the headache to go away, he just "deal[s] with it." (AR 50.)

## II.    The ALJ's Decision

---

[4] In February 2022, Claimant was placed on a trial of meloxicam for treatment of his chronic back pain and instructed to discontinue use of NSAIDs (e.g., Advil) while taking that medication. (*See* AR 834.) In March 2022, he was diagnosed with chronic kidney disease (*see* AR 719, 790-91), and it was noted by his nephrologist that he should not take NSAIDs (*see* AR 719-24). In July 2022, he was seen due to an abnormal liver function test, and his gastroenterologist, noting that Claimant reported that he takes Tylenol "sometimes 3 pills all at once" for his headaches, postulated that the abnormal liver function test results "could just be secondary to increase[d] [T]ylenol intake." (AR 760, 763.)

In her unfavorable decision, the ALJ applied the Commissioner's five-step sequential evaluation process.[5] (AR 14-30.) At step one, the ALJ found that Claimant has not engaged in substantial gainful activity since his alleged onset date of September 9, 2020. (AR 19.) At step two, the ALJ found that Claimant suffers from the severe impairments of: benign pre-sacral spinal tumor; degenerative disc disease of the lumbar spine without nerve root compression; mild degenerative change of the cervical spine; mild obesity; hypertension; chronic kidney disease. (AR 19.) She additionally noted the following medically determinable, but non-severe, impairments: enlarged prostate; migraine headaches. (AR 19.) At step three, the ALJ determined that none of Claimant's impairments or combination of impairments meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 20.)

At step 4,[6] the ALJ determined that Claimant has the RFC

> to perform light work as defined in 20 CFR [§] 404.1567(b). He can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. He can sit for at least 6 hours in an 8-hour workday and stand and walk for 6 hours in an 8-hour workday.

---

[5] The five-step sequential evaluation process requires the ALJ to determine whether:

    (1)      the claimant engaged in substantial gainful activity during the alleged period of disability;
    (2)      the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
    (3)      any such impairment meets or equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
    (4)      the claimant can return to her past relevant work; and, if not,
    (5)      the claimant is able to perform other work in the national economy, considering her RFC, age, education, and work experience.

20 C.F.R. § 404.1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

[6] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine the claimant's RFC. 20 C.F.R. § 404.1545(a)(1). Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given her RFC. *Id.* A claimant who can perform her past relevant work is not disabled. 20 C.F.R. § 404.1520(f).

He can occasionally stoop, crouch, kneel and crawl. He can never climb ladders, ropes, or scaffolds. He must completely avoid unprotected heights and hazardous moving machinery. He cannot work under very bright lighting, including direct sunlight, but can tolerate indoor fluorescent lighting. He cannot work in more than moderate noise environments.

(AR 20-21.) In light of this RFC, the ALJ concluded that Claimant is unable to perform any of his past relevant work as a stores laborer, solar energy system installer, manufacturing helper, or parking lot attendant. (AR 24.)

However, at step five, the ALJ found that an individual of Claimant's age with his education, work experience, and assessed RFC could perform other jobs existing in significant numbers in the national economy. (AR 24.) Specifically, the ALJ determined that an individual with Claimant's characteristics could perform the requirements of the representative occupations of cashier II, housekeeping cleaner, and sales attendant. (AR 24-25.) The ALJ then concluded that Claimant was not disabled from September 9, 2020, through the date he was last insured, December 31, 2022. (AR 25.)

### III.    Standard of Review

A federal court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, a court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007). In other words, courts do not reexamine the issues *de novo. Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741

(10th Cir. 1993). Courts will not disturb the agency's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). A federal court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## IV.    <u>Analysis</u>

Claimant argues that the ALJ committed reversible error in denying his claim for DIB because the RFC she assessed failed to account for the total limiting effects of his migraine

headaches, rendering her decision contrary to law and not supported by substantial evidence. (*See* Doc. 13 at 6-8; Doc. 20 at 1.) Specifically, he argues that the ALJ's decision fails to demonstrate proper consideration of the evidence regarding the intensity, persistence, and limiting effects of his headache-related symptoms and that the limited reasons she gave in support of the restrictions she imposed are, in fact, "false" and contradicted by evidence that she failed to discuss and appears to have failed to consider. (Doc. 13 at 6-7; *see* Doc. 20 at 3-5.) For the following reasons, I propose to find that Claimant's argument is well taken and recommend that his request for remand be granted.

### A. Assessing RFC in Cases Involving Primary Headache Disorders

In 2019, the Social Security Administration issued Social Security Ruling ("SSR") 19-4p, which "provides guidance on how we establish that a person has a medically determinable impairment (MDI) of a primary headache disorder and how we evaluate primary headache disorders in disability claims[.]" SSR 19-4p, 2019 WL 4169635, at *1 (Aug. 26, 2019). In relevant part, SSR 19-4p provides that "primary headache disorders" are "a collection of chronic headache illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head." *Id.* at *3. Migraines—both with aura and without aura—are a type of primary headache disorder. *See id.* Migraines without aura—the type of primary headache disorder with which Claimant was diagnosed in November 2018 (*see* AR 629)—are diagnosed after a person has suffered "five headache attacks" that satisfy the following criteria:

- Lasting 4 to 72 hours (untreated or unsuccessfully treated); and

- At least two of the following four characteristics:

  o Unilateral location;

  o Pulsating quality;

- o   Moderate or severe pain intensity; or

- o   Aggravation by or causing avoidance of routine physical activity (for example, walking or climbing stairs); and

- During headache, at least one of the following:

- o   Nausea or vomiting, or

- o   Photophobia [(light sensitivity)] and phonophobia [(sound sensitivity)].

SSR 19-4p, 2019 WL 4169635, at *5.

When a person is found to have a medically determinable impairment of a primary headache disorder but that disorder, alone or in combination with another impairment, does not medically equal a listing, the ALJ must "assess the person's residual functional capacity (RFC)[,]" which is "the most a person can do despite his or her limitation(s)." SSR 19-4p, 2019 WL 4169635, at *7. The ALJ "must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC." SSR 19-4p, 2019 WL 4169635, at *7. "For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration." *Id.* at *8. Other symptoms, such as pain, which "may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone[,]" must also be considered and accounted for in assessing a person's RFC. 20 C.F.R. § 404.1545(e).

In evaluating a person's symptoms when formulating a person's RFC, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017). The ALJ must

"explain which of an individual's symptoms [she] found consistent or inconsistent with the evidence in [the claimant's] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* "In evaluating an individual's symptoms, it is not sufficient for [the ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2017 WL 5180304, at *11. Rather, "[t]he determination or decision must contain *specific reasons* for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* (emphasis added).

**B. The ALJ failed to adequately explain her assessment of Claimant's headache-related symptoms and limitations.**

Here, the ALJ found that Claimant's migraines qualify as a medically determinable impairment. (*See* AR 19.) This is unsurprising given (1) his diagnosis in November 2018 of intractable chronic migraines without aura (*see* AR 629), and (2) the fact that migraine headaches are recognized as a primary headache disorder and considered a medically determinable impairment. *See* SSR 19-4p, 2019 WL 4169635, at *3. The ALJ next found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" he reported, which included pain, fatigue, and trouble concentrating. (AR 21.) This, too, is unsurprising given that SSR 19-4p expressly recognizes that primary headache disorders

are characterized by "recurring pain in the head, scalp, or neck" caused by "dysfunction of pain-sensitive structures in the head" and that "symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration." SSR 19-4p, 2019 WL 4169635, at *8.

Having found that Claimant has medically determinable impairments that could reasonably be expected to produce his symptoms, the ALJ was next required to "evaluate the intensity and persistence of [his] symptoms" and "determine how [his] symptoms limit [his] capacity to work." 20 C.F.R. § 404.1529(c)(1); *see* SSR 16-3p, 2017 WL 5180304, at *2, 3 (setting forth the "two-step process" for evaluating symptoms in making disability determinations and explaining that "once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established," ALJ must proceed to "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities"). In doing so, she was required to explain not only which of Claimant's symptoms she found consistent or inconsistent with the evidence in his record but also how her evaluation of those symptoms supported her conclusions regarding his residual functional capacity. *See* SSR 16-3p, 2017 WL 5180304, at *8. Her decision also needed to reflect consideration of Claimant's entire case record (both medical and nonmedical evidence), provide specific reasons for the weight she gave to Claimant's symptoms, and clearly articulate her reasoning in a way that allows for meaningful subsequent review. *See id.* at *4, 11. As explained below, I find that the ALJ's decision, unfortunately, does none of these things.

### 1. The ALJ's Decision

As noted above, the ALJ found that Claimant has the residual functional capacity to:

perform light work as defined in 20 CFR [§] 404.1567(b). He can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. He can sit for at least 6

hours in an 8-hour workday and stand and walk for 6 hours in an 8-hour workday. He can occasionally stoop, crouch, kneel and crawl. He can never climb ladders, ropes, or scaffolds. He must completely avoid unprotected heights and hazardous moving machinery. He cannot work under very bright lighting, including direct sunlight, but can tolerate indoor fluorescent lighting. He cannot work in more than moderate noise environments.

(AR 20-21.) In her narrative discussion supporting the foregoing RFC, the ALJ began with the

following summary of Claimant's hearing testimony:

At the hearing, the claimant alleged chronic lower back and neck pain. He testified that he cannot walk more than a single block and can only stand for about 20 minutes at a time. He can only sit for about 10 minutes at a time before needing to change positions. He believes he can only lift about 5 pounds. The claimant rarely drives and does not typically help with household chores and tasks due to pain. He testified regarding frequent migraine-type headaches that may be a factor of elevated blood pressure. He is often fatigued during the day and may rest or nap. He has trouble concentrating due to pain and reported that pain interrupts his sleep. (Testimony).

(AR 21.) She then stated:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(AR 21.)

Then, in approximately two pages, the ALJ proceeded to objectively summarize, without

analysis, select pieces of evidence from Claimant's medical records, as well as the findings of

consultative examiner Tiffany Shadle, CNP, and state agency consultants Mark A. Werner, M.D.,

and Helene Malabed, M.D. (AR 21-23.) The ALJ's summary principally focused on evidence

regarding Claimant's "chronic neck and back pain" and also contained brief mentions of other of

his medically determinable impairments, e.g., his chronic kidney disease and obesity. (*See id.*)

Regarding Claimant's headaches, the ALJ's summary contains two statements in which Claimant's

15

headaches are mentioned. First, in reviewing the medical evidence regarding Claimant's chronic neck and back pain, the ALJ stated, "While [Claimant] does express concern that his headaches may have a cervicogenic component, he has not sought direct treatment or evaluation for this condition, nor does he follow with a neurologist."[7] (AR 22.) Second, in discussing the consultative examination Claimant underwent with CNP Shadle in July 2022, the ALJ noted that Claimant "reported limitation due to back pain and headaches" but "confirmed being able to manage all activities of daily living." (AR 22.) Other than the preceding two statements and the ALJ's aforementioned statement that Claimant "testified regarding frequent migraine-type headaches that may be a factor of elevated blood pressure[,]" the ALJ's decision contains no further mention or discussion of Claimant's headaches.

Following her two-page summary of select evidence, the ALJ concluded:

> Having considered all the evidence, including the medical records not cited herein, the undersigned finds the claimant's allegations of disabling impairments not fully consistent with the evidence as a whole. However, consistent with the record, the undersigned reduced the residual functional capacity as indicated above, in accordance with the claimant's impairments. The medical and other evidence does not provide a basis for limitations greater than those determined in the residual functional capacity.

(AR 23.)

## 2. The Deficiencies in the ALJ's Decision

---

[7] Notably, neither of the two medical records cited by the ALJ in support of that statement—a December 2019 MRI report, and a December 2021 treatment note—in any way suggests that Claimant has not sought treatment for his headaches. Rather, both records appear to provide support for the ALJ's statement that Claimant expressed "concern that his headaches may have a cervicogenic component[.]"(AR 22.) The December 2019 MRI report describes and documents impressions regarding an MRI of Claimant's cervical spine, which indicated "minor degenerative changes of the cervical spine[.]" (AR 549.) The page of the December 2021 treatment note cited by the ALJ includes the provider's query regarding whether Claimant's migraines "[c]ould be due to uncontrolled blood pressure versus sleep apnea *versus arthritis in the cervical spine*?" (AR 855 (emphasis added).) Indeed, the December 10, 2021, treatment note cited by the ALJ indicates that Claimant's "Chief Complaint" for seeking treatment on that occasion was, in fact, "Headaches[.]" (AR 853.) And, as discussed more fully below, other evidence further demonstrates that Claimant has repeatedly sought treatment of his headaches for many years with everyone from his primary care physician and physical therapists to two different groups of neurologists, one that treated him with Botox injections and prescribed Aimovig, and the other who has sought to help manage his headaches by addressing his sleep apnea.

The Commissioner argues that the ALJ's decision not only reflects proper application of the law and consideration of Claimant's headaches but also includes "several workplace restrictions specifically to account for such headaches." (Doc. 19 at 9.) According to the Commissioner, the ALJ accounted for the functional limitations caused by Claimant's headaches by "restricting him to reduced light and noise environments, and as a precaution [by restricting] him from being around unprotected heights and moving machinery." (Doc. 19 at 7.) The Commissioner argues that the ALJ "gave [Claimant] the benefit of the doubt" by imposing the limitations she did, even where the "medical evidence . . . did not contain any assessments as to the severity or limiting effects of the headaches, nor their frequency." (Doc. 19 at 7.) For several reasons, I cannot agree with the Commissioner.

Initially, I find that it is not, in fact, apparent from the ALJ's decision which of the RFC restrictions she imposed are intended to "account for" Claimant's headaches, as opposed to his other medically determinable impairments. As explained above, the ALJ's decision neither discussed the consistency or inconsistency of any evidence nor provided reasoned analysis explaining what or how the evidence supports each of her findings, including the specific RFC restrictions she imposed. The ALJ's discussion, for example, contains no discussion explaining, and identifies no evidence supporting, her finding that Claimant "can tolerate indoor fluorescent lighting," a finding that appears to be related to Claimant's headache disorder but that does not fully account for Claimant's claimed headache-related functional limitations. Nor does the ALJ's decision explain what evidence supports any of her other findings regarding Claimant's functional limitations, including her findings that Claimant can tolerate moderate noise environments (which may, as the Commissioner argues, be intended to "account for" Claimant's headaches) and must avoid heights and moving machinery (a limitation that seems more likely directed to functional

limitations caused by Claimant's back-related impairments rather than his headaches). While the ALJ may, very well, have intended for the light, noise, and height/moving machinery restrictions to "account for" Claimant's headaches as argued by the Commissioner, her decision fails to make that intent clear in the first instance, leaving me unable to agree with the basic premise of the Commissioner's argument. *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself").

Moreover, even assuming *arguendo* that the ALJ did, indeed, intend for the three limitations identified by the Commissioner to "account for" Claimant's headaches, I agree with Claimant that the ALJ's findings regarding Claimant's RFC are not supported by substantial evidence and reflect a failure to properly consider the evidence of Claimant's headache-related limitations and apply the correct legal standards in this case. At a most basic level, the ALJ's decision fails to cite any medical facts or nonmedical evidence that supports each of her findings—specifically, her findings that Claimant "can tolerate indoor fluorescent lighting" and is able to work in a moderate-noise environment—and fails to include a discussion describing how the evidence supports each of the limitations she found. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."). I have no way of knowing, on the record before me, what evidence the ALJ found relevant to and supportive of each of her findings regarding Claimant's functional limitations.

As noted above, the ALJ's discussion explaining the "reasons" she found Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record" contains just two statements that mention Claimant's headaches. To the extent the ALJ, in fact, intended for either of those statements to be "reasons" (1) explaining her finding that Claimant's hearing testimony regarding the intensity, persistence, and limiting effects of his headaches was inconsistent with other evidence, and (2) supporting the more limited functional restrictions she assessed, I find, as discussed below, that those "reasons" are either inadequately explained or not supported by substantial evidence and that they do not support the RFC the ALJ assessed.

The first "reason" the ALJ gave for finding Claimant's testimony regarding the intensity, persistence, and limiting effects of his headaches "not entirely consistent with" other evidence is that Claimant "has not sought direct treatment or evaluation for [his headaches], nor does he follow with a neurologist." (AR 22.) As support for this finding, the ALJ cited two medical records: (1) a December 2019 MRI report containing impressions regarding Claimant's cervical spine (AR 549-551); and (2) the third page of a four-page treatment note documenting Claimant's December 10, 2021, visit to his PCP. (AR 855.) Initially, neither record supports—and, in fact, both belie—the ALJ's finding that Claimant has not sought treatment or evaluation for his headaches. The December 2019 MRI report indicates that the "Clinical Indication" for conducting the MRI was: "neck pain. Patient has history of migraine headaches. Patient has neck pain." (AR 549.) The December 10, 2021, treatment record indicates that Claimant sought treatment on that occasion due to a headache with "pain of 8 *with light sensitivity*" and was "[p]ositive for photophobia" upon examination. (AR 853 (emphasis added).) It further indicates that he was treated with an injection of ketorolac and given a prescription for 800-mg ibuprofen to treat his "intractable chronic migraine[.]" (AR 855.) The ALJ failed to explain—and I fail to see—how either piece of evidence she cited supports either (a) her finding that Claimant's testimony regarding the disabling nature

of his pain is inconsistent with other evidence of record, or (b) the functional limitations she assessed. Indeed, the December 2021 treatment note indicating that Claimant reported that he "is often sensitive to light," experiences "light sensitivity" when he has headaches, and was positive for "photophobia" when he sought treatment on that occasion is seemingly inconsistent with the ALJ's finding that Claimant "can tolerate indoor fluorescent lighting." Yet, the ALJ's decision contains no discussion of that evidence and fails to explain how she resolved that seeming inconsistency.

Regarding the ALJ's statement that Claimant "does not follow with a neurologist," I find that part of the ALJ's explanation problematic and inadequate for two reasons. First, it fails to reflect consideration of the fact that Claimant was, in fact, treated "at first" by a neurologist, who treated him not only with quarterly Botox injections but also Aimovig injections, and that Claimant discontinued that treatment because he found it ineffective. (*See* AR 49, 444.) Second, although referral to and treatment by a specialist is an appropriate factor to consider in evaluating a person's claims about their symptoms, it is not dispositive of the inquiry into whether a person's claims about the intensity, persistence, and limiting effects of their symptoms are consistent with the evidence of record. *See* SSR 16-3p, 2017 WL 5180304, at *9 (explaining that "[p]ersistent attempts to obtain relief of symptoms, such as . . . referrals to specialists . . . *may be an indication* that an individual's symptoms are a source of distress and may show that they are intense and persistent" and also identifying myriad other considerations—including "increasing dosages and changing medications, trying a variety of treatments, . . ., or changing treatment sources"—that may also be an indication of the intensity and persistence of a person's symptoms). Here, there is evidence indicating that Claimant sought treatment for his headaches over a long period of time from many different providers, including specialists (e.g., neurologists, sleep specialists, and physical

therapists) (*see* AR 444, 470-71, 476-77, 478, 479, 484-88, 629, 836); that his treatment has included the use of multiple types of medication, including prescription medications (Sumatriptan, oxycodone, prescription-strength ibuprofen, Botox injections, Aimovig injections, and ketorolac injections), as well as non-prescription medication (Tylenol) (*see* AR 471, 482, 630, 854, 856); that he was once administered a "migraine cocktail" upon seeking treatment for a headache with pain level 10 out of 10 at the emergency room (*see* AR 430-32); and that he has engaged in other forms of treatment, including repeated sessions of traction therapy and ongoing use of medical cannabis (*see* AR 482, 484-88, 749). The ALJ's decision not only contains no explanation of the purported significance of the fact that Claimant was no longer seeing a neurologist but also fails to evince proper consideration of this other evidence that the ALJ was required to consider. *See* SSR 16-13p, 2017 WL 5180304, at *7-9 (setting forth the "factors" that must be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms, including the medications a person takes and treatment other than medication a person receives for relief of pain or other symptoms, and explaining that, among other things, "we will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed"). For all of these reasons, I find that the ALJ's first "reason" for rejecting Claimant's testimony regarding the intensity, persistence, and limiting effects of his headaches is neither adequately explained nor supported by substantial evidence.

The second "reason" the ALJ gave for finding that Claimant's testimony regarding the intensity, persistence, and limiting effects of his "back pain and headaches" was "not entirely consistent with" the record was that Claimant "confirmed being able to manage all activities of daily living" at his July 2022 consultative examination. (AR 22.) Because Claimant's hearing testimony regarding the intensity, persistence, and limiting effects of his headaches, which the ALJ

effectively rejected, is central to my ensuing analysis, and because I find that the ALJ did not adequately or accurately summarize that testimony, I begin by setting forth the relevant portions of Claimant's testimony.

Claimant testified that he has headaches "every day" that are sometimes "very severe" and can be triggered by light. (AR 32, 44, 50.) Although he saw a neurologist "at first" and received injections to help manage his headaches, the injections "didn't help[.]" (AR 49.) His headaches sometimes last all day and make it "hard to focus" and "hard to . . . do anything throughout the day because" he just "want[s] to lay down." (AR 45, 50.) To get rid of the pain, he usually tries to lie down in a dark room without the lights on. (AR 46.) He sometimes lies down for six hours a day. (AR 47.) Because of issues with his liver and kidney function, the only medication he can take is Tylenol. (AR 50.) There are times when his headache won't go away and he is not able to get rid of it; on such occasions, he "just ha[s] to deal with it." (AR 50.) On a "good day," Claimant "might be able to help cook for a little bit" and might be able to "shower, brush [his] teeth, stuff like that." (AR 47.) However, when Claimant has a headache or pain, his wife "helps with taking the kids to school, cooking, . . . all of that". (AR 46-47.) Claimant's 16-year-old son also helps with things like preparing meals. (*Id.*) Also, because of his back pain, Claimant can only stand for 10 or 20 minutes at a time, meaning that he "usually" has his son or wife do the dishes. (AR 49-50.) Additionally, his wife and 16-year-old help "remind [him] to take [his] medication and stuff like that" because he is unable to focus due to his pain, which is "constant every day." (AR 49.)

The ALJ, in support of her finding that Claimant "confirmed being able to manage all activities of daily living," cited a single piece of evidence: CNP Shadle's July 2022 report, in which CNP Shadle indicated that Claimant reported being able to engage in the following activities of daily living: bathing, dressing, eating, cooking, and cleaning. (AR 699.) To the extent the ALJ,

indeed, discounted and effectively rejected Claimant's testimony regarding the intensity, persistence, and limiting effects of his headache-related symptoms based on a purported inconsistency with CNP Shadle's report, there are three problems with the ALJ's decision.

First, the ALJ failed to distinguish between Claimant's different symptoms in discussing the evidence and failed to explain which of Claimant's symptoms she found consistent or inconsistent with evidence regarding his daily activities. That is problematic because the record contains evidence of not only a variety of headache-related symptoms[8] (e.g., pain, photophobia, difficulty focusing) but also various back-impairment-related symptoms, none of which the ALJ discussed, either generally or vis-à-vis her finding that Claimant's claims regarding his symptoms are "not entirely consistent with" CNP Shadle's report, specifically. Notably, while both impairments result in pain for Claimant, the functional limitations he experiences as a result of the pain differ depending on which impairment is the source of the pain. The pain caused by Claimant's headaches results in Claimant needing to lie down in a dark room for sometimes up to six hours at a time. (*See* AR 46, 47.) In contrast, the functional limitations caused by Claimant's back pain relate to things like how long Claimant can stand or walk and how much weight he can carry; indeed, Claimant testified that lying down for long periods (e.g., when he has headaches) tends to exacerbate his back pain. (*See* AR 46, 49-50, 52.) Because the ALJ's decision fails to explain, in the first instance, which of Claimant's myriad symptoms she found consistent or inconsistent with CNP Shadle's report and further fails to explain how she resolved any inconsistencies she found, I am unable to assess how she evaluated Claimant's symptoms or conclude that her decision is consistent with and supported by the evidence. *See* SSR 16-3p, 2017 WL 5180304, at *8, 11.

---

[8] In the context of disability determinations, the term "symptoms" means "[the claimant's] own description of [his or her] physical or mental impairment." 20 C.F.R. § 404.1502(i). "Symptoms" may include, but are not limited to, "pain, fatigue, . . . or periods of poor concentration" and "cannot always be measured objectively through clinical or laboratory techniques." SSR 16-3p, 2017 WL 5180304, at *3, 5.

Second, the ALJ's generalized statement that Claimant "confirmed being able to manage all activities of daily living" not only exaggerates the evidence but also fails to reflect proper consideration of the specific facts regarding what Claimant reported being able to do. *See Krauser v. Astrue*, 638 F.3d 1324, 1332-33 (10th Cir. 2011) (explaining that to determine the probative value of evidence regarding a claimant's activities of daily living, "it is necessary to look at the actual activities [the claimant] was talking about" because "the specific facts behind the generalities [may] paint a very different picture"). CNP Shadle's report—the only evidence the ALJ cited to support her finding that Claimant "confirmed being able to manage all activities of daily living"—contains a table listing five types of activities (bathing, dressing, eating, cooking, cleaning) and marking an "X" next to each of the five activities in a column with the heading "Yes, able to perform." (AR 699.) It contains no information reflecting specific facts regarding how Claimant actually engaged in any of the listed activities, except, notably, an indication that with respect to "cleaning," Claimant can only engage in "Short tasks." (AR 699.) Regarding the specific facts relating to Claimant's engagement in activities of daily living, Claimant *did not* testify that he "does not typically help with household chores and tasks due to pain," as the ALJ characterized his testimony. (AR 21.) Rather, as discussed above, Claimant testified that if, for example, he was "in the kitchen helping to prepare a meal" and "started to have a headache or pain," he would "call [his] oldest son and [his] wife to help [him], and [he] would go lay down[,]" sometimes for up to six hours. (AR 46-47.) He also testified that because he can stand for only 10 or 20 minutes at a time, he usually asks his wife or son to do the dishes. (AR 49-50.) Claimant's testimony confirms that he, indeed and consistent with what he reported to CNP Shadle, participates in daily activities, such as cooking, and clarified that he does so only until the onset of a headache or for 10-20 minutes until the onset of back pain. The ALJ's decision fails to explain what, if anything, is

inconsistent between Claimant's testimony and CNP Shadle's report and, assuming the existence of actual material consistencies, how she resolved them.

Finally, and importantly, the ALJ's reliance on evidence regarding Claimant's activities of daily living to discount his testimony fails to reflect the well-established rule that "sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity[.]" *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993). Even assuming that Claimant engages in daily bathing, dressing, eating, cooking, and cleaning, that evidence is insufficient, on this record, to support the ALJ's rejection of his testimony regarding his disabling pain and her findings that Claimant can perform light work under fluorescent lighting in a moderate-noise environment for 8 hours a day, 5 days a week. *See id.* (explaining that "the ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain"). As discussed herein, the ALJ's decision neither identifies any evidence supporting the functional limitations she assessed nor evinces proper consideration of significantly probative evidence tending to reinforce Claimant's claims of disabling pain and the greater functional limitations he argues should have been included in his RFC. For all these reasons, I find that the ALJ's second "reason" for rejecting Claimant's testimony regarding the intensity, persistence, and limiting effects of his headache-related symptoms is neither adequately explained nor supported by substantial evidence.

In sum, I find that the ALJ's decision fails not only to explain what evidence supports each of her conclusions regarding Claimant's functional limitations but also to evince that she considered, even if she did not discuss, all of the evidence relevant to her assessment of Claimant's RFC. Specifically, the ALJ failed to adequately explain why she discounted Claimant's testimony regarding the intensity, persistence, and limiting effects of his headache-related symptoms and why

she omitted from his RFC more restrictive functional limitations related to his headache-related symptoms. On the record in this case, the ALJ's statements that (1) she carefully considered the evidence, (2) she found Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms "not entirely consistent" with the other evidence, and (3) the "medical and other evidence does not provide a basis for limitations greater than those determined in the residual functional capacity" she assessed are exactly the types of "conclusory statements" that are insufficient to support her decision. *See* SSR 16-3p, 2017 WL 5180304, at *11. Reversal and remand are required.

## V.    <u>Conclusion</u>

Having thoroughly reviewed the administrative record, I find that the ALJ committed reversible error by failing to adequately explain her assessment of Claimant's headache-related symptoms and limitations and failing to demonstrate that she considered all the evidence regarding Claimant's headache-related functional limitations in assessing his RFC and rendering her disability determination. Because her decision does not explain what evidence supports her findings or how she considered and resolved material inconsistencies in the evidence of record, the ALJ did not provide the Court with "a sufficient basis to determine that appropriate legal principles have been followed" and that substantial evidence supports her decision. *Jensen*, 436 F.3d at 1165.

Accordingly, I recommend that Plaintiff's Motion to Reverse and Remand (Doc. 12) be GRANTED, that the Commissioner's Decision be REVERSED, and this matter REMANDED to the Commissioner for further proceedings.

**Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after a party is served with a copy of these proposed findings and**

recommended disposition that party may, pursuant to Section 636(b)(1)(C), file written objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen-day period allowed if that party wants appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE